## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| UNDER SEAL, | NO. _____ |
| Plaintiff, | |
| v. | |
| UNDER SEAL, | JURY TRIAL DEMANDED |
| Defendant. | |
| | **FILED IN CAMERA AND UNDER SEAL PURSUANT TO 31 U.S.C. 3730** |

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| UNITED STATES OF AMERICA and STATE OF NEW JERSEY ex rel. JOHN DOE, | NO. _____ |
| Plaintiff and Relator, | |
| v. | JURY TRIAL DEMANDED |
| CAREONE, LLC, CAREONE MANAGEMENT, LLC, HEALTHBRIDGE MANAGEMENT, LLC, and DANIEL E. STRAUS, | **FILED IN CAMERA AND UNDER SEAL PURSUANT TO 31 U.S.C. 3730** |
| Defendants. | |

1343254.7

## I.    STATEMENT OF THE CASE

1.    This is an action to recover damages and civil penalties on behalf of the United States and the State of New Jersey arising from false and/or fraudulent records, statements and claims made, used and caused to be made, used or presented by Defendants CareOne, LLC, CareOne Management, LLC, Healthbridge Management LLC, and Daniel E. Straus ("CareOne" or "Defendants") under the False Claims Act and the New Jersey False Claims Act.

2.    CareOne operates approximately 33 health care centers in New Jersey, including, among other things, skilled nursing facilities, assisted living centers, and long-term acute care hospitals.

3.    CareOne operates its business extremely aggressively, employing a mix of lawful *and unlawful* practices to maximize government money.  As a result, it has received among the most, if not the most, funding from Government Payors in the State of New Jersey as compared to any other similar providers.

4.    Most notably, since at least 2008, CareOne has created sham medical directorships and used other improper influence to ensure a steady stream of referrals, in violation of the Anti-Kickback Act, 42 U.S.C. § 1320a-7b ("AKA"), and the Stark Law, 42 U.S.C. § 1395nn(a)(1) ("Stark").  The beneficiaries of CareOne's improper payments and/or gifts include nearly everyone in the referral chain:  doctors, hospital discharge planners, and hospital-based social workers.  CareOne also donates heavily to hospitals themselves to promote so-called "preferred provider relationships."  CareOne acknowledged as recently as June 30, 2016 in a radio program that it had no fewer than 15 preferred provider relationships with New Jersey hospitals.

5.      As the bookend to CareOne's unlawful patients-procurement scheme, CareOne also engages in patient dumping when those once-sought-after patients approach the end of their Medicare benefits.

6.      As a result of CareOne's practices, the United States Government and State of New Jersey are harmed.

## II.    JURISDICTION AND VENUE

7.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and 31 U.S.C. § 3732, the latter of which specifically confers jurisdiction on this Court for actions brought pursuant to the Federal False Claims Act, 31 U.S.C. §§ 3729 and 3730. Relator establishes subject matter jurisdiction under 31 U.S.C. § 3730(b).  This Court also has supplemental jurisdiction over the state claim under 28 U.S.C. § 1367.

8.      There has been no public disclosure within the meaning of § 3730(e)(4)(A) of the allegations Relator is asserting.

9.      This Court has personal jurisdiction and venue over CareOne pursuant to 28 U.S.C § 1391(b) and 31 U.S.C § 3732(a), which authorizes nationwide service of process, because CareOne has minimum contacts with the United States.

10.      Venue is proper in this district pursuant to 31 U.S.C. § 3732(a) because CareOne has regularly conducted substantial business within the District of New Jersey at all relevant times.

## III.    PARTIES

### A.    Plaintiff and Relator John Doe

11.      Mr. Doe is a New Jersey resident who owns and/or operates long-term care facilities in New Jersey.

12.     Mr. Doe has had extensive and long-standing personal interaction with numerous current and former employees of CareOne, and with entities with which CareOne does business.

**B.     Defendants**

13.     Defendant CareOne, LLC, headquartered in Fort Lee, New Jersey, is a Delaware limited liability company that owns a network of 33 skilled nursing facilities, assisted living facilities and long-term acute care hospitals located throughout the State of New Jersey under the CareOne brand.

14.     By its own admission, CareOne has generated revenue from over 100,000 patients and has developed, operated and managed more inpatient health care properties in the New York metropolitan area (which includes New Jersey) than any other operator.

15.     Defendant CareOne Management, LLC, is a wholly owned subsidiary of Defendant CareOne, LLC.

16.     Defendant Daniel E. Straus is a citizen and resident of the State of New Jersey.  Daniel Straus is Chairman and CEO and principal owner of CareOne, LLC. Mr. Straus' other health care holdings include Ascend Concierge Home Care, Ascend Home Health, Ascend Hospice, Ascend Rehab, CareVirginia, Healthbridge Management and Partners Pharmacy. He is also the Chairman and majority owner of InnovaCare Health (formerly known as Aveta, Inc.).

17.     In addition to its strong presence in New Jersey in particular, CareOne is a national operator with a presence in multiple states in the Midwest, New England, and the Mid-Atlantic area.

18.     Defendant Healthbridge Management, LLC ("Healthbridge") is a limited liability company organized under the laws of the State of New Jersey and headquartered

in Fort Lee, New Jersey.  It is the contract manager for healthcare facilities around the country, including in four New Jersey locations:  Oradell, Woodcrest, South Jersey and Somerset.

## IV.    REGULATORY FRAMEWORK

19.    The Anti-Kickback Statute ("AKS") makes it illegal for individuals or entities to knowingly and willfully "offer[] or pay[] remuneration (including any kickback, bribe, or rebate) ... to any person to induce such person ... to purchase, ... order, ... or recommend purchasing ... or ordering any good ... or item for which payment may be made in whole or in part under a Federal health care program." 42 U.S.C. § 1320a-7b(b)(2).  Violation of the AKS is a felony punishable by fines and imprisonment and can also result in exclusion from participation in federal health care programs. 42 U.S.C. § 1320a-7b(b)(2) and 42 U.S.C. § 1320a-7(b)(7).

20.    As codified in the Patient Protection and Affordable Care Act of 2010 ("PPACA"), Pub. L. No. 111-148, § 6402(f), 124 Stat. 119, codified at 42 U.S.C. § 1320a-7b(g), "a claim that includes items or services resulting from a violation of this section constitutes a false or fraudulent claim for purposes of [the FCA]."

21.    According to the legislative history of the PPACA, this amendment to the AKS was intended to clarify "that all claims resulting from illegal kickbacks are considered false claims for the purpose of civil actions under the False Claims Act, even when the claims are not submitted directly by the wrongdoers themselves." 155 Cong. Rec. S10854.

22.    Compliance with the AKS, 42 U.S.C. § 1320a-7b(b), is thus a condition of payment under the federal health care programs and, in turn, the use of sham medical directorships is a kickback under applicable law and OIG guidance:

a.    A skilled nursing facility must have a medical director who is responsible for implementing care policies and coordinating medical care. 42 C.F.R. § 483.70.

b.    Companies have created sham medical directorships and used them to compensate physicians for referrals in violation of the AKS. In a June 9, 2015, Fraud Alert titled "Physician Compensation Arrangements May Result in Significant Liability," the Office of Inspector General (OIG) for the Department of Health and Human Services (HHS) cautioned that "a compensation arrangement may violate the anti-kickback statute if even one purpose of the arrangement is to compensate a physician for his or her past or future referrals of Federal health care program business."

c.    In a presentation for doctors, the HHS OIG states that paying or accepting Medicare and Medicaid funds for sham medical directorships is a crime:

> Remuneration includes anything of value and can take many forms besides cash, such as free rent, expensive hotel stays and meals, and excessive compensation for medical directorships or consultancies. **In some industries, it is acceptable to reward those who refer business to you. However, in the Federal health care programs, paying for referrals is a crime.**

HHS OIG, "A Roadmap for New Physicians: Avoiding Medicare and Medicaid Fraud and Abuse," *available at* https://oig.hhs.gov/compliance/physician-education/roadmap_web_version.pdf (emphasis in original) (accessed March 23, 2017).

23.    Similarly, the Stark Law prohibits the submission of claims for health services furnished based upon a referral from a physician who has an improper financial relationship with an entity. 42 U.S.C. § 1395nn(a)(1). Sham medical directorships can constitute such improper referral arrangements.

## V.    RELIABLE INDICIA DEMONSTRATES THAT CAREONE HAS SUBMITTED FALSE CLAIMS TO GOVERNMENT PROGRAMS.

### A.    CareOne Has Paid Health Care Providers and Others Income and Other Benefits for Referrals to Its Facilities and Has Engaged in Related Misconduct.

24.    Defendants have systematically induced doctors, discharge planners, and social workers at hospitals to refer their patients to Defendants' facilities by paying them as Medical Directors or giving them expensive gifts.

#### 1.    Defendants Hired Doctors as Medical Directors In Order to Induce Referrals of Patients.

25.    CareOne has developed a business strategy of inducing referrals from doctors by hiring them as Medical Directors for its facilities. While nursing facilities such as the ones managed by CareOne require only one Medical Director, CareOne typically hires numerous physicians as Medical Directors for each facility in order to induce those physicians to refer patients to the facilities.

26.    Tim Hodges, Chief Strategy Officer at CareOne, was particularly skilled at bringing in new Medical Directors. He would spend substantial sums of money on Medical Directors and social events. Hodges has also been on the Board of Managers of the Hackensack University Medical Center.[1]

27.    A formal Regional Director for CareOne stated that once CareOne hired a Medical Director for a specific hospital, the referrals from that hospital increased dramatically. For example, Dr. P.W. referred patients to a CareOne competitor. However, after he became "Associate Medical Director" of the dementia unit at

---

[1] CareOne has a practice of involvement in and donations to large referral sources, and its principals and officers have held various Board and other positions at such entities. These include HUMC, Englewood Hospital, and Holy Name Hospital.

Woodcrest Health Care Center at CareOne, he stopped referring patients to the competitor.

28.    Several of the doctors hired by CareOne as Medical Directors are orthopedic surgeons. This is atypical for skilled nursing facilities, and suggests that Medical Directors are hired based on their ability to refer patients rather than their medical skills.

29.    When Dr. E.D., a Medical Director at CareOne at Oradell, failed to refer a sufficient number of patients to CareOne, Dr. E.D. was quickly terminated by Daniel Straus. Dr. E.D. was told that CareOne was terminating her because of excessive readmissions of her patients from CareOne to hospitals. However, the number of readmissions of her patients was far smaller than what CareOne claimed.

30.    Dr. E.D. believes that she was actually terminated because CareOne wanted to hire a Medical Director from Holy Name Medical Center in order to build better relations with that hospital.

31.    J.H., a former Administrator at CareOne at Oradell, believes that Dr. E.D. was terminated for not having enough admissions. CareOne would monitor the discharges from hospitals by paying hospital liaisons to go to hospitals and monitor their census. The hospital liaisons were also responsible for entertaining social workers and physicians.

**2.    Defendants Induce Patient Referrals by Providing Expensive Gifts to Doctors, Discharge Planners, and Social Workers.**

32.    CareOne builds relationships with physicians by inviting them to lunches at their facilities, taking them to dinners at fancy restaurants, and sending them gifts. Among the gifts provided to physicians were tickets to sporting events, cruises, trips to

spas, expensive dinners, alcohol, iPads, and luggage. CareOne would also offer to assign its own unassigned patients to referring physicians.

33.    A former Administrator (D.R.) stated that he would have been terminated if he did not entertain physicians, discharge planners, and social workers, as that was part of the job. CareOne induces discharge planners and social workers at hospitals to direct discharged patients to CareOne facilities by inviting them to parties and sending them lunch and gifts.

34.    Around Christmas 2011, CareOne sent a corporate memo stating that each facility could give each discharge planner and social worker at local hospitals a gift card worth $25. As there were eight CareOne facilities with overlapping regions, they pooled their funds to give each discharge planner and social worker at the local hospitals a $200 gift card.

35.    Over time, the discharge planners and social workers came to expect the gifts in exchange for referring patients. For example, on one occasion, a social worker went to a competing nursing home and stated that they expected to be taken to the Cheesecake Factory, as CareOne had recently taken them there.

36.    When a CareOne competitor complained to Hackensack University Medical Center (HUMC) about the gifts and meals provided to its employees, the competitor lost substantial business from HUMC. CareOne was categorized as a preferred facility at HUMC and a discharge planner at Hackensack University Medical Center stated that they were instructed to discharge patients to preferred facilities, including CareOne at Wellington.

3.    **CareOne's Kickbacks Undermine Patient Choice and Cause Harm.**

37.    For example, HUMC would transfer patients to CareOne facilities notwithstanding expressed preferences by patients and their families (sometimes even their doctors) for other facilities, sometimes by effective fiat, others by fraudulent representations.

38.    For example, M.J. was a patient at HUMC. Her daughter requested that she be transferred to a CareOne competitor following her discharge. However, they were not given a choice and told that M.J. would be transferred to CareOne at Teaneck. On April 30, 2016, M.J. was transferred to the CareOne facility against her wishes.

39.    S.R. was a patient at HUMC. He and his wife requested that he be transferred to a CareOne competitor, as the CareOne facility was too far for S.R.'s wife to visit him. However, the social worker ignored their requests and S.R. was transferred to CareOne at Ridgewood on September 9, 2015.

40.    M.S., a patient at HUMC, and her daughter requested a transfer to a CareOne competitor. They were falsely told that the competitor did not accept their insurance and M.S. was transferred to CareOne at Wellington. On or around January 13, 2016, another patient, A.C., notwithstanding the notations in his medical record of his preference for competitor facilities, was sent to Wellington.

41.    Another example of a transfer procured by misstatements was on or around May 19, 2016. A patient who had formerly been at a CareOne competitor was in need of rehab, and was told, incorrectly, by HUMC that the (non-CareOne) facility at issue did not have capacity to perform rehabilitation services.

4. **Once Defendants Acquired Patients, They Tailored Care Around Reimbursements, and Discharged Patients When They Were No Longer Profitable.**

42.    In addition to illegally inducing healthcare professionals to refer patients, CareOne inflated billing for services provided to its patients. CareOne employees received brutal pressure to meet billing targets.

43.    Employees were instructed to go back and review patients three or four times to determine if anything else could be done to increase revenue. Employees were prohibited from discharging more than two patients a day in order to maintain the census. CareOne tailored rehabilitation services to the patient's insurance reimbursement rather than patient needs.

44.    A formal Regional Director (S.G.) stated that it was impossible to meet CareOne's targets without falsifying billing information. Ian Oppel, Senior Vice-President of Rehabilitation, gave a talk to new employees and told them that half of them would lose their jobs within a year because they would not be able to hit the targets set by CareOne management. Indeed, CareOne management regularly terminated or demoted people who could not meet the targets.

45.    S.G. stated that CareOne directed its employees to tailor rehabilitation services to patients in a manner calculated to maximize and exhaust the revenue available from patients' insurance coverage. In describing CareOne's focus on the payor rather than on the patient, S.G. stated "what they are doing is not right."

46.    Once a patient's Medicare benefits have been exhausted, CareOne does its best to discharge that patient to another nursing home, send them home or return them to the hospital rather than provide any additional and necessary care. If the patient does not have Medicaid, but qualifies for it, CareOne does nothing to help the patient obtain the

Medicaid coverage. Even if the patient does have Medicaid, CareOne still makes every effort to discharge that patient because the reimbursement is significantly less than CareOne was receiving under the Medicare coverage and thus the overall revenue is much lower. CareOne routinely tells patients and their family members that they don't have any Medicaid beds available and they transfer the patients to any other nursing home. CareOne extracts the maximum reimbursement from the individual patients before they dump them to surrounding nursing homes. This practice results in the patients being upended and their care disrupted in order for CareOne to make room for another high-paying Medicare patient.

47. For example, I.G. was a Medicare patient at a CareOne competitor, but had been transferred to HUMC at the request of a family member due to the possibility that the patient might require subacute rehabilitation care. Following her stay at the hospital, HUMC falsely advised the family member that the CareOne competitor does not provide rehabilitation services. In response, the family member agreed to discharge the patient to CareOne's Wellington facility instead of returning the patient to her original facility. Later, when I.G.'s Medicare benefits had been exhausted but I.G. still required long term care, the family member was told that there were no Medicaid beds available at Wellington.

48. G.G. was a Medicare patient at CareOne's Woodcrest facility. When her Medicare benefits were exhausted, Woodcrest referred her to a CareOne competitor. However, that facility could not admit the patient because the patient lacked any additional insurance coverage.

-11-

**B.    Analysis of Medicare and Medicaid Cost Reports, IRS Data, and Other Data Corroborates the Non-Public Information.**

49.    Medicare Provider Data collected by the Government corroborates the non-public information provided by Relator. This data reveals that Government has reimbursed CareOne skilled nursing facilities in New Jersey at substantially higher rates than other skilled nursing facilities, and also that CareOne has used multiple Medical Directors paid at more than Fair Market Value.

50.    CareOne receives large sums of money from the Government. In calendar year 2014, the most recent year for which Medicare payment data is available, CareOne operated 23 skilled nursing facilities in New Jersey, with a total of 2,934 beds in service and eligible for reimbursement by the Government. (Outside New Jersey, it operated 37 facilities, totaling 5,433 Medicare beds, in eight states.) CareOne received a total of $318,678,884 in Medicare skilled nursing payments in 2014, $197,818,467 of which was paid to CareOne for patient stays in its New Jersey facilities. After subtracting deductibles and coinsurance, Medicare paid CareOne $151,141,849 in skilled nursing payments in New Jersey in 2014.[2]

51.    CareOne receives a disproportionate amount of Medicare funds on a per-facility basis. CareOne's 23 New Jersey skilled nursing facilities constituted **6.4%** of the 359 skilled nursing facilities participating in Medicare in New Jersey in 2014. Nonetheless, CareOne received **12.1%** of Medicare skilled nursing payments in New Jersey in 2014.

---

[2] The former figures are based on the Total SNF Medicare Allowed Amount, which consists of "the sum of the amount Medicare pays, the deductible and coinsurance amounts that the beneficiary is responsible for paying, and any amounts that a third party is responsible for paying." The latter are based on the Total SNF Medicare Payment Amount—the "amount that Medicare paid for all Medicare stays in the year after deductible and coinsurance amounts have been deducted."

1343254.7

52.     CareOne receives a disproportionate amount of Medicare funds on a per-bed basis. CareOne's 2,934 skilled nursing beds in service in New Jersey constituted **5.6%** of the 52,274 skilled nursing beds in service participating in Medicare in New Jersey in 2014. Nonetheless, CareOne received **12.1%** of Medicare skilled nursing payments in New Jersey in 2014.

53.     CareOne receives a disproportionate amount of Medicare funds on an average-payment-per-bed basis. CareOne received an average Medicare payment of $67,423 per skilled nursing bed in service in 2014. This is more than *double* the average per-bed payment of $31,342 for all skilled nursing facilities in New Jersey in 2014.

54.     Seven (7) of the top 20 recipients of Medicare skilled nursing payments in New Jersey in 2014, measured on a per-bed basis, were CareOne facilities. Of these, the highest per-bed payment amount was received by CareOne at Wayne-SNF, which received $149,207 per bed—nearly *five times* the average per-bed payment of $31,342 for all skilled nursing facilities in New Jersey in 2014.

55.     Three (3) of the top 100 recipients of Medicare skilled nursing payments in the United States in 2014, measured on a total-amount-received basis, are CareOne facilities in New Jersey. The CareOne facility that received the largest amount of Government funds was CareOne at Teaneck, which received $17,003,214 in Medicare skilled nursing payments, or $132,838 per Medicare bed.

56.     CareOne's Medicare occupancy rates[3] are substantially higher than the New Jersey average, further corroborating the kickback scheme described above.

---

[3] Medicare occupancy rates are calculated from CMS skilled nursing facility payment data by dividing total Medicare days by the number of beds in each category and multiplying by 365 days per year.

CareOne's average New Jersey Medicare occupancy rate in 2014 was 31.34%, more than *twice* the average occupancy rate of 15.2% for all skilled nursing facilities receiving Medicare funds in New Jersey. Four (4) of CareOne's 23 skilled nursing facilities had a Medicare occupancy of over 50% of overall bed capacity—more than *three (3) times* the New Jersey average.

57.     CareOne's highest Medicare occupancy in 2014 was CareOne at Moorestown, which had a 65.7% Medicare occupancy rate—more than *four (4) times* the New Jersey average.

58.     In addition to receiving Medicare funds, most (although not all) of the CareOne facilities in New Jersey receive some Government funds in the form of Medicaid Long-Term Care (LTC) payments. In FY2015, the most recent year for which aggregate data is available, New Jersey nursing facilities received $1,661,945,387 in fee-for-service Medicaid payments. Although provider-level data is not available for these funds, if CareOne received 10% of these payments—less than its 12.1% share of Medicare skilled nursing facility payments—it would have received over $166 million in Medicaid funds in FY2015.

59.     Earlier-maintained data sheds further light on how it came to be that CareOne obtained so much government funding. New Jersey Medicaid Cost Reports for calendar year 2010 demonstrate that the average per-facility fees paid to 1099-paid (independent contractor) physicians by CareOne, who appear to be Medical Directors, across all 306 New Jersey Medicaid facilities, was $36,032. The per-facility average at CareOne's 16 New Jersey Medicaid facilities was **$75,717**—more than *twice* the statewide average for Medical Director fees.

60. CareOne's physician compensation also demonstrates that CareOne uses sham Medical Directorships to disguise a kickback scheme.

61. As stated in paragraph 25, the average nursing facility in New Jersey has one Medical Director, and it is a part-time position. Some CareOne facilities in New Jersey have had six or more physicians who have been paid fees, stipends, and/or honorariums on a regular basis, according to inferences from Medicaid cost reports. All of this is further corroboration of Relator's knowledge.

## VI.    CAREONE'S UNLAWFUL CONDUCT HAS CAUSED THE SUBMISSION OF FALSE CLAIMS TO FEDERAL AND STATE HEALTH CARE PROGRAMS.

62. Government Programs, including Medicare and Medicaid, do not cover claims where there is a kickback involved in the underlying transaction.

63. In order to enroll in and bill Medicare, providers must sign CMS Form 855A, which states:

> I agree to abide by the Medicare laws, regulations and program instructions that apply to this provider. ... I understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations, and program instructions (including, but not limited to, the Federal anti-kickback statute and the Stark law), and on the provider's compliance with all applicable conditions of participation in Medicare.

64. In order to receive payments from CMS, a provider including CareOne must submit a cost report on behalf of each skilled nursing facility, using Form CMS-2540 and/or CMS-2552. On this form, a provider reports reimbursable costs and other payment-related data in detail. Before submitting the form, CareOne must certify that: the services were provided in compliance with all health care laws and regulations, and the reported data is "true, correct, complete and prepared from the books and records of the

provider in accordance with applicable instructions, except as noted." CareOne must sign

a certification statement acknowledging that:

> IF SERVICES IDENTIFIED IN THIS REPORT WERE
> PROVIDED OR PROCURED THROUGH THE
> PAYMENT DIRECTLY OR INDIRECTLY OF A
> KICKBACK OR WERE OTHERWISE ILLEGAL,
> CRIMINAL, CIVIL AND ADMINISTRATIVE ACTION,
> FINES AND/OR IMPRISONMENT MAY RESULT.

65.    Similarly, any provider who submits claims to Medicaid must sign a

provider agreement with each Medicaid program to which it submits claims.

66.    In order to receive Medicaid payments from the New Jersey Department

of Senior Services, a provider including CareOne must submit a cost report which it

certifies "is a true, correct, and complete statement prepared from the books and records

of the provider(s) in accordance with N.J.A.C. 8:85, and the CMS Provider

Reimbursement Manual." The report states that:

> MISREPRESENTATION OR FALSIFICATION OF ANY
> INFORMATION CONTAINED IN THIS COST REPORT
> MAY BE PUNISHABLE BY FINE AND/OR
> IMPRISONMENT UNDER STATE OR FEDERAL LAW.

67.    Claims that were submitted to Government Programs as a result, in part or

in whole, were tainted by kickbacks provided by CareOne and were therefore false within

the meaning of the federal False Claims Act and State analogs.

68.    CareOne's payment of kickbacks therefore caused the submission of

claims that were false and not eligible for reimbursement to Government Programs.

69.    CareOne's payment and offers of payment of kickbacks were made

knowingly and with the intent to cause the submission of false claims to Government

Programs.

70.    Similarly, CareOne's violations of the Stark Law were made knowingly and with the intent to cause the submission of false claims to Government Programs.

## COUNT I

### Violation of False Claims Act, 31 U.S.C. § 3729(a)(1)(A)

71.    Relator incorporates herein by reference the preceding paragraphs of the Complaint as though fully set forth herein.

72.    CareOne knowingly presented and caused to be presented to the Government false or fraudulent claims for payment, in violation of 31 U.S.C. § 3729(a)(1).

73.    As a result of CareOne's actions as set forth above in this Complaint, the United States of America has been, and may continue to be, severely damaged.

## COUNT II

### Violation of False Claims Act, 31 U.S.C. § 3729(a)(1)(B)

74.    Relator incorporates herein by reference the preceding paragraphs of the Complaint as though fully set forth herein.

75.    CareOne knowingly made, used, or caused to be made or used, false or fraudulent records or statements material to the payment of a false or fraudulent claims, thereby causing false or fraudulent claims for payment to actually be paid or approved, in violation of 31 U.S.C. § 3729(a)(2).

76.    The United States of America, unaware of the falsity of the claims and/or statements made by CareOne, and in reliance on the accuracy of these claims and/or statements, paid and may still be paying or reimbursing for services and care provided to

individuals at CareOne facilities who are at such facilities, in part, based on kickbacks and/or violations of the Stark Law.

77.    As a result of CareOne's actions as set forth above in this Complaint, the United States of America has been, and may continue to be, severely damaged.

## COUNT III

### Violation of the State of New Jersey False Claims Act,

### N.J. Stat. Ann. § 2A:32C-1 *et seq.*

78.    Relator incorporates herein by reference the preceding paragraphs of this Complaint as though fully set forth herein.

79.    This is a civil action brought by Relator, on behalf of the State of New Jersey, against CareOne pursuant to the New Jersey Fraud False Claims Act, N.J. Stat. Ann. § 2A:32C-5(b).

80.    CareOne, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly or intentionally presented or caused to be presented, and may still be presenting or causing to be presented, to an employee, officer or agent of the State of New Jersey, or to any contractor, grantee, or other recipient of State funds, false or fraudulent claims for payment or approval, in violation of N.J. Stat. Ann. § 2A:32C-3(a).

81.    CareOne, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to made or used, and may still be making, using or causing to be made or used, false records or statements to get false or fraudulent

claims paid or approved by the State of New Jersey, or its political subdivisions, in violation of N.J. Stat. Ann. § 2A:32C-3(b).

82.    CareOne, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money to the State of New Jersey, or its political subdivisions, in violation of N.J. Stat. Ann. § 2A:32C-3(g).

83.    In addition, N.J.S.A. § 30:4D-17 prohibits the solicitation or receipt of any remuneration, including any kickback, bribe or rebate, directly or indirectly, overtly or covertly, in cash or in kind in return for furnishing any item or service for which payment may be made in whole or in part under the New Jersey Medicaid program.

84.    CareOne violated N.J.S.A. § 30:4D-17 by engaging in the conduct alleged herein.

85.    CareOne further violated the New Jersey False Claims Act by its deliberate and systematic violation of federal and state laws, including the federal Anti-Kickback Act, the Stark Law, and N.J.S.A. § 30:4D-17, compliance with which are express and implied conditions of payment for claims submitted to the State of New Jersey.

86.    The State of New Jersey, or its political subdivisions, unaware of the falsity of the claims and/or statements made by CareOne, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay, for health care services to CareOne.

87.    As a result of CareOne's actions, as set forth above, the State of New Jersey and/or its political subdivisions have been, and may continue to be, severely damaged.

WHEREFORE, Relator prays for judgment against Defendants as follows:

A.    That CareOne be ordered to cease and desist from submitting any more false claims, or further violating the FCA and the New Jersey False Claims Act;

B.    That judgment be entered in the United States of America's favor and against CareOne in the amount of each and every false or fraudulent claim, multiplied as provided for in 31 U.S.C. § 3729(a)(1), plus a civil penalty per claim as provided by 31 U.S.C. § 3729(a)(1), as adjusted by the Federal Civil Penalties Inflation Adjustment Act Improvements Act of 2015, Public Law 114-74 (Nov. 2, 2015) (currently set at $10,857 to $21,916), to the extent such multiplied penalties shall fairly compensate the United States of America for losses resulting from the various schemes undertaken by CareOne, together with penalties for specific claims to be identified at trial after full discovery;

C.    That judgment be entered in the State of New Jersey's favor and against CareOne in the amount of the damages sustained by the State of New Jersey multiplied as provided for in the statute, plus a civil penalty of not less than and not more than the civil penalty allowed under the Federal False Claims Act;

D.    That Relator be awarded the maximum amount allowed pursuant to 31 U.S.C. § 3730(D) and N.J. Stat Ann. § 2A:32C-7;

E.    That CareOne be ordered to disgorge all sums by which it has been enriched unjustly by its wrongful conduct; and

F.    That judgment be granted for Relator against CareOne for all costs,

including, but not limited to, court costs, litigation costs, expert fees, and all attorneys' fees incurred by Relator in the prosecution of this suit; and

      G.    That Relator be granted such other and further relief as the Court deems just and proper.

## JURY TRIAL DEMAND

Pursuant to Federal Rule of Civil Procedure 38(a), Relator hereby demands a trial by jury of all issues so triable.

Dated: May 11, 2017           Respectfully submitted,

By: _____
    (District of New Jersey Bar No. JS-6110)

Ross B. Brooks
Jennifer Siegel
Inayat Hemani
SANFORD HEISLER SHARP, LLP
1350 Avenue of the Americas
31st Floor
New York, NY 10019
Telephone:    (646) 402-5650
Facsimile:    (646) 402-5651
rbrooks@sanfordheisler.com
jsiegel@sanfordheisler.com
ihemani@sanfordheisler.com

Wendy R. Fleishman
Rachel Geman
LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
250 Hudson Street, 8th Floor
New York, NY 10013-1413
Telephone:    (212) 355-9500
Facsimile:    (212) 355-9592

John T. Spragens
LIEFF CABRASER HEIMANN & BERNSTEIN, LLP

One Nashville Place
150 Fourth Avenue North, Suite 1650
Nashville, TN 37219-2423
Telephone:    (415) 956-1000
Facsimile:    (415) 956-1008

*Attorneys for Relator*